# EXHIBIT "1"

<u>ASSET PURCHASE AGREEMENT</u>

This **ASSET PURCHASE AGREEMENT** ("Agreement") is entered into and made effective this 30th day of October, 2007 ("Effective Date"), by and between ISR Systems Corporation, a California corporation ("Seller") and Tagistics Corporation, a Florida corporation ("Buyer"). Seller and Buyer may be referred to hereafter as a "Party" and, collectively, as the "Parties".

### RECITALS

A.      Seller is the owner of certain assets which include a proprietary software application and related hardware generally described as its TAG3 platform which provides for the manufacture and sale of RFID tags (the "Business").

B.      Buyer desires to purchase from Seller substantially all of the assets owned by Seller related to the Business, including tangible and intangible personal property, inventory, goodwill, and other assets of the Business as identified in this Agreement.

C.      Subject to the terms and conditions contained in this Agreement, Seller desires to sell to Buyer, and Buyer agrees to purchase from Seller, substantially all of the assets of Seller related to the Business.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF THE ASSETS

1.1.      <u>Purchase and Sale of Assets</u>. Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, at Closing (as defined below), all of Seller's right, title, and interest in and to certain assets used by Seller in connection with the operation of the Business (the "Assets"), which shall consist of the following:

(a)      All of the tangible personal property, hardware, equipment, and any other property as set forth on <u>Schedule 1</u> (the "Personal Property");

(b)      Each contract, agreement, license and other rights or agreements, whether written or oral, as set forth on and subject to the terms of <u>Schedule 2</u> (the "Contracts");

(c)      The software application as described on and subject to the terms of <u>Schedule 3</u> (the "TAG3 Platform"); and

(d)      Seller's right, title, and interest in and to the trade names, logos, copyrights, service marks, pending trademark and service mark applications, licenses, domain names and goodwill associated with the Business as set forth on <u>Schedule 4</u> (the "Intangible Property").

- 1 -

1.3.    **Risk of Loss.** Except for any losses or damages to the Assets proximately caused by the Buyer's conduct, Seller assumes all risk of loss or damage to the Assets prior to the Closing. In the event there is any material loss or damage to all or any portion of the Assets prior to the Closing, Buyer may either terminate this Agreement pursuant to Article XII, or negotiate with Seller for a proportionate reduction in the Purchase Price to reflect the loss or damage. For the purposes of this provision, the term "material loss or damage" shall mean any loss or damage to the Assets with an aggregate cost of Ten Thousand Dollars ($10,000.00).

## ARTICLE II
## ASSUMPTION OF LIABILITIES

2.1.    **Assumption of Liabilities.** Effective as of the Closing Date (as defined below), and in addition to any other liabilities expressly assumed by Buyer under this Agreement, Buyer shall assume responsibility for the performance and satisfaction of all of the executory obligations and liabilities of Seller listed on Schedule 5 (the "Assumed Liabilities") subject to the terms and conditions of the Assignment of Contracts entered into by and between Seller and Buyer.

2.2.    **Excluded Liabilities.** Except as expressly provided in this Agreement, Buyer shall not assume or become liable for any obligations, commitments, or liabilities of Seller, whether known or unknown, absolute, contingent, or otherwise, and whether or not related to the Assets, including, without limitation, any employment, business, sales, or use tax relating to Seller's operation of the Business and use and ownership of the Assets prior to the Closing.

## ARTICLE III
## CONSIDERATION FOR THE ASSETS

3.1.    **Cash & Cash Equivalent Consideration.**    The cash and cash equivalent consideration to be paid by Buyer to Seller for the Assets (the "Purchase Price") shall be One Million Dollars ($1,000,000.00). Buyer shall pay the Purchase Price as follows:

(a)    One Hundred Thousand Dollars ($100,000.00) in cash or certified funds delivered to Seller on the Closing Date; and

(b)    A duly executed original Secured Promissory Note in the form attached hereto, marked Exhibit "A" (the "Note"), in the principal sum of Nine Hundred Thousand Dollars ($900,000.00) delivered on the Closing Date;

3.2.    **Equity.** In addition to the Purchase Price, as additional consideration for the purchase of the Assets, on the Closing Date, Buyer shall deliver to Seller a stock certificate for Two Hundred Fifty Thousand (250,000) shares of common stock of Buyer issued in the name of Seller (the "Stock"). After the Closing Date, Buyer shall have the right, upon thirty (30) days prior written notice to Seller, to redeem all of the Stock for Five Million Dollars ($5,000,000.00) in cash or certified funds. Buyer's right of redemption must be exercised in whole, not in part.

3.3.    **Services.** In addition to the Purchase Price and the Stock, as additional consideration for the purchase of the Assets, Buyer will provide Seller with hosting services for a period of eighteen (18) months commencing on the Closing Date, the scope as well as the terms and conditions of which are more particularized in that certain hosting services agreement in the form attached hereto, marked Exhibit "B" (the "Hosting & Services Agreement"); provided,

-2-

however, should Buyer be unable to obtain an assignment of the SAP Software License identified in Schedule 2 (the "SAP License"), then Buyer shall only be obligated to provide Seller with hosting services for a period of eleven (11) months commencing on the Closing Date. In the event Buyer actually pays a fee for the assignment of the SAP License, then the hosting services to be provided by Buyer to Seller in accordance with this Section 3.3 shall be reduced on a pro-rata basis at the rate of Five Thousand Dollars ($5,000.00) per month, provided Buyer provides Seller with written proof of the payment of such assignment fee.

    3.4. _Releases_. In addition to the Purchase Price, the Stock and the Hosting Services, as additional consideration for the purchase of the Assets, Buyer will provide Seller with full general releases executed by Herbert Goertz, Thomas Goertz, Chris Terry, Huba Horompoly, Hunbead, LLC, Linkena Anstalt, Terry & Associates, LLC, RemoteSAPConsulting Network, Ltd. and Rumina, Ltd., an exemplar of which is attached hereto, marked _Exhibit "C"_ (collectively, the "Buyer General Releases").

    3.5. _Allocation of Purchase Price_. The Purchase Price shall be allocated among the Assets as follows:

    (a)    Tangible Property: One Hundred Forty Five Thousand Fifty Nine and 47/100 Dollars ($145,059.47); and

    (b)    Goodwill and Going Concern: Eight Hundred Fifty Four Thousand Nine Hundred Forty and 53/100 Dollars ($854,940.53).

    3.4. _Effect of Allocation_. The Parties agree to abide by the allocation of the Purchase Price specified in this Agreement, and agree to report the transaction as so allocated for income tax purposes.

## ARTICLE IV
## CLOSING

    4.1. _Time and Place of Closing_. The closing for the purchase and sale of the Assets (the "Closing") shall be held at 4695 MacArthur Court, Suite 300, Newport Beach, California twelve (12) business days after Buyer's publication of the bulk sale notice required under California's Commercial Code section 6105 (the "Closing Date").

    4.2. _Seller's Closing Obligations_. On the Closing Date, Seller shall deliver to Buyer each of the following items:

    (a)    A duly executed bill of sale (the "Bill of Sale"), in the form attached as _Exhibit "D"_ and fully incorporated hereat by this reference, conveying all of Seller's right, title, and interest in and to the Personal Property to Buyer;

    (b)    A duly executed assignment of contracts (the "Assignment of Contracts") in the form attached as _Exhibit "E"_ and incorporated by reference, pursuant to which Seller shall assign to Buyer all of Seller's right, title and interest in and to, and Buyer shall accept and assume all of Seller's obligations in respect of, the Contracts;

(c)     A duly executed assignment of intangible property (the "Assignment of Intangible Property") in the form attached as Exhibit "F" and fully incorporated hereat by this reference, pursuant to which Seller shall assign all of its right, title, and interest in the Intangible Property to Buyer;

(e)     A full general release duly executed by Seller and Universal Guardian Holdings, Inc. in the form attached hereto, marked Exhibit "H" (the "Seller General Release");

(f)     A certificate from the President of Seller certifying the resolutions of the shareholders and Board of Directors of the Seller as well as the Board of Directors of Universal Guardian Holdings, Inc. authorizing this Agreement; and

(g)     To the extent necessary, an assignment to Buyer from Universal Guardian Holdings, Inc. if it holds any of the Assets in its name.

4.3.    Buyer's Closing Obligations. On the Closing Date, Buyer shall deliver to Seller each of the following items:

(a)     One Hundred Thousand Dollars ($100,000.00) in cash or certified funds;

(b)     The original Note executed by Buyer;

(c)     A Security Agreement executed by Buyer in the form attached hereto, marked Exhibit "I";

(d)     The Stock;

(e)     The Hosting & Services Agreement;

(f)     The Buyer General Releases duly executed by Herbert Goertz, Thomas Goertz, Chris Terry, Huba Horompoly, Hunbead, LLC, Linkena Anstalt, Terry & Associates, LLC, RemoteSAPConsulting Network, Ltd. and Rumina, Ltd.;

(g)     Executed counterparts of any documents required to be signed by Buyer pursuant to this Agreement, including, but not limited to the Bill of Sale, the Assignment of Contracts and the Assignment of Intangible Property; and

(h)     A certificate from the President of Buyer certifying the resolutions of the shareholders and the Board of Directors of the Buyer authorizing this Agreement

4.4.    Expenses of Closing. The expenses for the Closing shall be paid as follows:

(a)     Seller shall pay all sales and use taxes arising out of the transfer of the Assets, if any.

(b)     Except as otherwise expressly provided in this Agreement, all other Closing fees and costs, including, but not limited to, legal fees, accounting fees, consulting fees, and other

incidental expenses in connection with the transactions contemplated by this Agreement shall be borne by the Party that incurs the expense(s).

4.5.    <u>Proration of Expenses</u>. Except as otherwise expressly provided in this Agreement, all expenses associated with the operation of the business as well as the Assets being conveyed to Buyer, including, but not limited to, personal, business and property taxes, hosting charges, utility charges and any other contractual expenses, shall be apportioned ratably between the Parties as of the Closing Date on the basis of a 30-day month. This obligation to make apportionments shall survive the Closing.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

5.1.    <u>Seller's Representations and Warranties</u>. Seller makes the following representations and warranties to Buyer, each of which is true and correct as of the Effective Date, and will be true and correct as of the Closing Date:

(a)    Seller is a corporation, duly organized, validly existing, and in good standing under the laws of the State of California and is qualified to transact business in the State of California.

(b)    Seller has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms.

(c)    The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Seller is a party, or any law, judgment, or order of which Seller is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(d)    There are no actions, suits, proceedings, or claims now pending, or, to the best of Seller's knowledge, threatened against Seller or the Assets that would affect Seller's ability to fulfill its obligations under this Agreement or that would impair the value of the Assets.

(e)    Seller has, and will have at Closing, good and marketable title to the Assets free and clear of all liens, charges, and encumbrances.

(f)    Seller has provided Buyer with true and correct copies of the contracts to be assumed by Buyer. To Seller's knowledge, each such contract is in full force and effect, have been duly executed by the parties, and neither Seller nor any other party is in default under such contracts.

(g)    Seller has provided Buyer with true and correct copies of all documents evidencing Seller's rights in the intangible property. To Seller's knowledge, each agreement, instrument, or license with respect to the intangible property is in full force and effect, and Seller is not in default under any such agreements.

- 5 -

(h)    Except as expressly set forth in this paragraph 5.1, Seller makes absolutely no representations or warranties whatsoever concerning the operation, use, scalability, functionality, fitness for a particular purpose or any other aspect concerning the value or use of the Assets. Buyer hereby acknowledges that it is purchasing the Assets "AS IS" and that Buyer has conducted to its complete satisfaction all the due diligence it has determined in Buyer's sole and absolute discretion is necessary and appropriate.

5.2.    <u>Correctness of Representations</u>. No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

6.1.    <u>Buyer's Representations and Warranties</u>. Buyer makes the following representations and warranties to Seller, each of which is true and correct as of the Effective Date and shall be true and correct as of the Closing Date:

(a)    Buyer is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Florida.

(b)    Buyer has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

(c)    The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Buyer is a party, or any law, judgment, or order of which Buyer is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(d)    There is no action, proceeding, or claim pending, or, to Buyer's knowledge, threatened, against Buyer that would affect Buyer's ability to consummate the transactions contemplated by this Agreement.

(e)    No consent, approval, or authorization of or declaration, filing, or registration with any governmental or regulatory authority is required in connection with the execution, delivery, and performance by Buyer of this Agreement or the consummation of the transactions contemplated by the Agreement.

(f)    The Stock, once issued and as of the Closing Date, will constitute five percent (5%) of the total outstanding shares of Buyer on a fully diluted basis (including by way of example and not limitation, the issuance of any shares of common stock to American River Packaging, Inc. as well as any one or more of the persons providing the Buyer General Releases). If Buyer at any time after the Closing Date proposes to register any of its securities

under the Securities and Exchange Act of 1933 for sale to the public, whether for its own account or for the account of other security holders or both, except with respect to registration statements on Forms S-4, S-8 or another form not available for registering the Stock for sale to the public, provided the Stock is not otherwise subject to an effective registration statement, Buyer will give the Seller written notice thereof ("Notice of Registration") and cause the Stock to be included with the securities to be covered by the registration statement proposed to be filed by the Buyer.

6.2.    Correctness of Representations. No representation or warranty of Buyer in this Agreement or any other information furnished by Buyer pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, exhibits, and other information provided by Buyer to Seller shall be true and correct on and as of the Closing Date as though made on that date.

## ARTICLE VII
## SELLER'S PRE-CLOSING OBLIGATIONS

7.1.    Maintenance of Property Pending Closing. At all times prior to the Closing Date, Seller shall continue to maintain the Assets and conduct the operation of the Business in the same manner as they have been maintained and operated by Seller prior to the execution of this Agreement.

7.2.    Consents. On or before the Closing Date, Seller, at its expense, shall obtain all necessary consents required to assign Seller's interest in any of the Assets to Buyer as contemplated by this Agreement. In the event Seller is unable to obtain any such consent on or before the Closing Date, Buyer may terminate this Agreement as provided in Article XII.

7.3.    Discharge of Liens. All liens, claims, charges, security interests, pledges, assignments, or encumbrances relating to the Assets shall be satisfied, terminated, and discharged by Seller on or prior to the Closing Date and evidence reasonably satisfactory to Buyer and its counsel of the satisfaction, termination, and discharge shall be delivered to Buyer at or prior to the Closing.

## ARTICLE VIII
## MUTUAL COVENANTS

8.1.    Further Assurances Prior to Closing. Seller and Buyer shall, prior to the Closing Date, execute any and all documents and perform any and all acts reasonably necessary, incidental, or appropriate to effect the transactions contemplated by this Agreement.

8.2.    Notification of Changed Circumstances. At any time after the Effective Date and prior to the Closing Date, if either party becomes aware of any fact or circumstance that would materially change any representation or warranty made under this Agreement, the Party with knowledge of those facts shall notify the other in writing as soon as possible after the discovery of the changed circumstances.

8.3.    <u>Compliance With Bulk Sales Law</u>. On or before the Effective Date, Seller will provide Buyer with a bulk transfer affidavit. Except for circumstances outside of Buyer's control, within five (5) business days of Buyer's receipt of the bulk transfer affidavit from Seller, Buyer will cause the notice required under Commercial Code §6105 to be published consistent with subdivision (b) thereof.    Buyer will further comply with all other applicable provisions of Division 6 of the Commercial Code.

8.4.    <u>Broker's Fees</u>. Each Party represents and warrants that no broker, finder, or any other person or entity has any claim for any brokerage commissions or fees in connection with any of the transactions contemplated by this Agreement. Each Party shall indemnify the other against any claim or loss suffered as a result of any claim for brokerage commissions or fees payable, or claimed to be payable, on the basis of any actions in connection with this Agreement.

8.5    <u>Press Release</u>.    Within four (4) business days of the Closing Date, Seller and Buyer shall issue a mutually acceptable press release announcing this Agreement. The content of the press release shall conform with the securities laws of the United States.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

9.1.    <u>Buyer's Conditions</u>. The obligation of Buyer to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction or receipt, on or before the Closing Date, of each of the following conditions:

(a)    Seller shall have provided the Seller General Release duly executed by Seller and Universal Guardian Holdings, Inc. on behalf of itself and all of its subsidiaries;

(b)    Seller shall have provided executed counterparts of any documents required to be signed by Seller pursuant to this Agreement, including, but not limited to the Bill of Sale, the Assignment of Contracts and the Assignment of Intangible Property;

(c)    Seller shall have provided Buyer with a written request for assignment addressed to each of the software providers set forth on Schedule 2, with the exception of the SAP License;

(d)    The representations and warranties of Seller set forth in Article V shall be true and correct as of the Closing Date;

(e)    Seller shall have substantially performed and complied with all of the agreements, covenants, and conditions required of Seller by this Agreement on or before the Closing Date;

(f)    No action, suit, or proceeding before any court or any governmental body or authority that would in any way affect the Assets or the ability of the parties to consummate the transactions contemplated by this Agreement shall have been instituted or threatened on or before the Closing Date;

(g)    The Assets shall be in substantially the same condition on the Closing Date as on the Effective Date, and there shall be no loss or damage to the Assets prior to the Closing;

(h)    Seller shall have obtained all necessary agreements and consents of any parties required to consummate the transactions contemplated by this Agreement

(i)    Notwithstanding any provision herein to the contrary, should the SAP License not be assignable to Buyer, then Seller's obligation to assign the SAP License is hereby waived by Buyer in which event Buyer shall be obligated to provide Seller with hosting services for a period of eleven (11) months commencing on the Closing Date as set forth in Section 3.3 above. In the event Buyer actually pays a fee for the assignment of the SAP License, then the hosting services to be provided by Buyer to Seller in accordance with Section 3.3 shall be reduced on a pro-rata basis at the rate of Five Thousand Dollars ($5,000.00) per month, provided Buyer provides Seller with written proof of the payment of such assignment fee;

(j)    Notwithstanding any provision herein to the contrary, should any one or more of the software providers identified on Schedule 2 (with the exception of the SAP License) refuse to consent to an assignment of their respective licenses to Buyer, then Buyer agrees that such software license(s) shall be excluded from the Assets defined under Section 1.1 without any recourse or offset whatsoever to Seller's rights hereunder and that Buyer waives Seller's obligation to deliver such software licenses as required under Section 4.2 and this Section 9.1.

(k)    A certificate from the President of Seller certifying the resolutions of the shareholders and Board of Directors of the Seller as well as the Board of Directors of Universal Guardian Holdings, Inc. authorizing this Agreement; and

(l)    To the extent necessary, an assignment to Buyer from Universal Guardian Holdings, Inc. if it holds any of the Assets in its name.

9.2.    **Failure to Satisfy Buyer's Conditions.** Any of Buyer's conditions precedent may be waived in whole or in part by Buyer in writing at any time on or before the Closing Date. In the event all Buyer's conditions precedent have not been waived by Buyer or substantially satisfied on or before the Closing Date, Buyer may elect to terminate this Agreement in accordance with Article XII.

### ARTICLE X
### CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

10.1.    **Seller's Conditions.** The obligation of Seller to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction or receipt, on or before the Closing Date, of each of the following conditions:

(a)     Seller shall have received from Buyer:

  (i)     One Hundred Thousand Dollars ($100,000.00) in cash or certified funds;

  (ii)    The original Note executed by Buyer;

  (iii)   The Security Agreement executed by Buyer;

  (iv)    A certificate for the Stock;

  (v)     The Hosting & Services Agreement executed by Buyer;

  (vi)    The Buyer General Releases duly executed by Herbert Goertz, Thomas Goertz, Chris Terry, Huba Horompoly, Hunbead, LLC, Linkena Anstalt, Terry & Associates, LLC, RemoteSAPConsulting Network, Ltd. and Rumina, Ltd.;

  (vii)   Executed counterparts of any documents required to be signed by Buyer pursuant to this Agreement, including, but not limited to the Bill of Sale, the Assignment of Contracts and the Assignment of Intangible Property; and

  (viii)  All other instruments and documents necessary to consummate the transactions contemplated by this Agreement.

(b)     Buyer shall have performed and complied with all of the agreements, covenants, and conditions required of Buyer by this Agreement on or before the Closing Date;

(c)     The representations and warranties of Buyer set forth in Article VI shall be true and correct as of the Closing Date;

(d)     Buyer shall have substantially performed and complied with all of the agreements, covenants, and conditions required of Buyer by this Agreement on or before the Closing Date;

(e)     Save and except Buyer's waivers at paragraphs 9.1(i) and (j), Buyer shall have obtained all necessary agreements and consents of any parties required to consummate the transactions contemplated by this Agreement;

(f)     A certificate from the President of Buyer certifying the resolutions of the shareholders and Board of Directors of the Buyer authorizing this Agreement

10.2.    **Failure to Satisfy Seller's Conditions.** Any of Seller's conditions precedent may be waived in whole or in part by Seller in writing at any time on or before the Closing Date. In the event all Seller's conditions precedent have not been waived by Seller or substantially satisfied on or before the Closing Date, Seller may elect to terminate this Agreement pursuant to Article XII.

## ARTICLE XI
## POST-CLOSING OBLIGATIONS

11.1.    **Further Assurances.** Each Party agrees to do all acts and things and to make, execute, and deliver such written instruments as shall be reasonably necessary to carry out the terms and provisions of this Agreement. This covenant of further assurances shall survive the Closing Date.

## ARTICLE XII
## TERMINATION

12.1.    <u>Termination</u>. This Agreement may be only terminated as follows:

(a)    By the mutual written consent of Buyer and Seller executed at any time prior to the Closing Date.

(b)    By Buyer at any time prior to the Closing Date as expressly provided in this Agreement, or if any condition precedent to Buyer's obligations set forth in Article IX has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing Date.

(c)    By Seller at any time prior to the Closing Date as expressly provided in this Agreement, or if any condition precedent to Seller's obligations set forth in Article X has not been substantially satisfied in full or previously waived by Buyer in writing, at or prior to the Closing Date.

(d)    By Seller if Buyer does not timely publish the bulk sale notice required under Section 8.3 above.

(e)    By Seller if Buyer does not close by the Closing Date.

12.2.    <u>Effect of Termination</u>. Except as otherwise expressly provided herein, in the event of the termination of this Agreement pursuant to the provisions of this Article XII, this Agreement shall become void and have no effect, without any liability on the part of any of the parties.

## ARTICLE XIII
## INDEMNIFICATION

13.1.    <u>Seller's Indemnification</u>. Seller shall indemnify and hold Buyer harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorney fees and costs, in any way arising from or related to: (a) Seller's ownership or use of the Assets, or Seller's operation of the Business, prior to the Closing Date; (b) the failure or falsity of any representation or warranty of Seller contained in this Agreement; or (c) the failure by Seller to observe or perform any other covenant or agreement to be observed or performed by Seller under this Agreement.

13.2.    <u>Buyer's Indemnification</u>. Buyer shall indemnify and hold Seller harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorney fees and costs, in any way arising from or related to: (a) Buyer's ownership or use of the Assets, or Buyer's operation of the Business, after the Closing Date; (b) the failure or falsity of any representation or warranty of Buyer contained in this Agreement; or (c) the failure by Buyer to observe or perform any other covenant or agreement to be observed or performed by Buyer under this Agreement.

13.3.    <u>Survival of Indemnities</u>. The mutual agreements to indemnify set forth in this Article XIII shall survive the Closing Date.

13.4      Indemnification Procedure.  In the event any indemnifiable claim arises under
this Agreement, whoever is entitled to indemnification pursuant to this Article XIII (the
"Indemnified Party") will promptly notify the Party who is obligated to indemnify the other
Party pursuant to this Article XIII (the "Indemnifying Party") in writing of that claim, which
notice will set forth the basis of the claim for indemnity and, if then determinable by the
Indemnified Party's reasonable estimate of the amount thereof (or, if in the Indemnified Party's
good faith opinion, no such reasonable estimate can then be made by it, the maximum potential
damages that, in the Indemnified Party's good faith opinion, might be sustained in connection
with such claim). Notwithstanding anything herein to the contrary, no delay on the part of either
party in notifying the other shall relieve the Indemnifying Party from any obligation hereunder
unless (and then solely to the extent) the Indemnifying Party is thereby prejudiced by virtue of
such delay.

13.5      Third Party Claims.

(a)      If any third party shall notify any party with respect to any matter (a "Third
Party Claim") which may give rise to a claim for indemnification by one party against the other
party under this Article XIII, then the party who receives notice of the Third Party Claim shall
promptly notify the other party thereof in writing.  As used in this Article XIII, the term
"Indemnified Party" shall mean the party who is entitled to indemnification and the term
"Indemnifying Party" shall mean the party who is obligated to indemnify the other party.
Notwithstanding anything contained herein to the contrary, no delay on the part of either party
in notifying the other party shall relieve the Indemnifying Party from any obligation hereunder
unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced by virtue of
such delay.

(b)      Any Indemnifying Party will have the right to defend the Indemnified Party
against the Third Party Claim with counsel of its choice reasonably satisfactory to the
Indemnified Party so long as: (a) the indemnifying Party notifies the Indemnified Party in writing
within 15 days after the Indemnified Party has received or given notice, as the case may be, of the
Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and
against the entirety of any Damages the Indemnified Party may suffer resulting from, arising out
of, relating to, in the nature of, or caused by the Third Party Claim; (b) the Indemnifying Party
provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party
that the Indemnifying Party will have the financial resources to defend against the Third Party
Claim and fulfill its indemnification obligations hereunder, including reasonable attorneys' fees
and costs of litigation/arbitration, together with any possible award of judgments or settlement
entered against the Indemnified Party; and (c) the Indemnifying Party conducts the defense of
the Third Party claim actively and diligently.

(c)      So long as the Indemnifying Party is conducting the defense of the Third Party
Claim in accordance this Article XIII, the Indemnified Party may retain separate co-counsel at its
sole cost and expense and participate in the defense of the Third Party Claim, (b) the Indemnified
Party will not consent to the entry of any judgment or enter into any settlement with respect to
the Third Party Claim without the prior  written consent of the Indemnifying Party (which
consent shall not be unreasonably delayed or withheld) and (c) the Indemnifying Party will not
consent to the entry of any judgment or  enter into any settlement with respect to the Third Party

- 12 -

Claim without the prior written consent of the Indemnified Party (such consent not to be withheld unreasonably and such consent not to be withheld at all if the judgment or settlement contains a full release reasonably satisfactory to the Indemnified Party). Notwithstanding anything contained herein to the contrary, the Indemnified Party may require that any such judgment or settlement which is to be entered against it shall include a confidentiality or non-disclosure agreement with the third party claimant.

(d)     In the event any of the conditions in paragraph 13.5(b) above is or becomes unsatisfied (a) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (b) the Indemnifying Party will    reimburse    the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (c) the Indemnifying Party will remain responsible for any Damages the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section.

13.6     Remedies Cumulative. The remedies provided in this Agreement will be cumulative and will not preclude any Party from asserting any other rights or seeking any other remedies against any other Party or its successors or assigns.

**ARTICLE XIV
CONFIDENTIALITY**

14.1     Non-Disclosure of Confidential Information. Buyer hereby accepts and acknowledges that Seller's Confidential Information (as defined below) constitutes information that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and, as such, constitutes a trade secret of Seller within the meaning of California's Uniform Trade Secrets Act (Civil Code §3426 et seq.). Buyer recognizes that it is in Seller's legitimate business interest to restrict the disclosure and use of Confidential Information for any purpose other than in connection with the due diligence to be conducted by Buyer in connection with the transaction contemplated by this Agreement, and to prohibit any misappropriation of such Confidential Information by Buyer. Buyer therefore agrees that all Confidential Information heretofore or in the future obtained by Buyer shall be considered confidential and the proprietary information of Seller. During or at any time subsequent to the termination of this Agreement or the consummation of the transaction contemplated hereby, Buyer shall not use or disclose, or authorize any other person to use or disclose, any Confidential Information. Buyer hereby further accepts and acknowledges that the covenants contained in this Article XIV shall survive the termination of this Agreement or the consummation of the transaction contemplated hereby.

14.2     Confidential Information Defined. Confidential Information includes any and all proprietary techniques or confidential information (whether now or hereafter existing) which Seller or its affiliates may own, develop, compile or otherwise use, including not only information disclosed by Seller to Buyer under paragraph 14.1. Confidential Information also consists of any and all information that has or could have commercial value or constitutes trade secrets of Seller or other utility in the business in which Seller or its affiliates is engaged or

contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Seller or its affiliates, whether or not such information is specifically labeled as Confidential Information by Seller, including without limitation proprietary techniques or confidential information that relates to Seller's present or anticipated activities or are used or useable by Seller in the conduct of the Business. By way of example and without limitation, Confidential Information includes any and all information developed, obtained, used, licensed by or to or owned by Seller or its affiliates concerning Seller's customers, vendors, advertisers, publishers, as well as any other trade secrets, techniques, know-how (including designs, plans, procedures, merchandising, marketing, distribution and warehousing know-how, processes, and research records), software, computer programs and designs, development tools, and any other intellectual property created, used or sold (through a license or otherwise) by Seller or its affiliates, know-how and processes, innovations, discoveries, improvements, research, development, test results, reports, specifications, data, formats, marketing data and plans, business plans, strategies, forecasts, unpublished financial information, orders, agreements and other forms of documents, price and cost information, merchandising opportunities, expansion plans, store plans, budgets, projections, customer, supplier, licensee, licensor and subcontractor identities, characteristics, agreements and operating procedures, and salary, staffing and employment information. The term "Confidential Information" shall not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by Buyer; (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller; or (iii) following the Closing Date relates to Business acquired by Buyer.

      14.3      <u>Return of Documents and Property</u>.  In the event this Agreement is terminated prior to the Closing Date or the transaction contemplated hereby is not consummated for any other reason, or at any time upon the request of Seller, Buyer (or Buyer's officers, directors, shareholders, subsidiaries, affiliates) shall deliver to Seller the following: (a) all documents and materials (including, without limitation, computer files) containing Confidential Information; and (b) all documents, materials, equipment and other property (including, without limitation, computer files, computer programs, computer operating systems, computers, printers, scanners, pagers, telephones, credit cards and identification cards) belonging to Seller, which in either case are in the possession or under the control of Buyer (or the Buyer's heirs or personal representatives).

      14.4      <u>Specific Performance</u>.  Buyer hereby acknowledges and agrees that violation of any of the covenants and provisions set forth in this Agreement, including without limitation Buyer's covenants contain in this Article XIV, would cause Seller to suffer irreparable damage and agrees that Seller's remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of this fact, in the event of a breach or threatened breach by Buyer of any of the provisions of this Agreement, it is agreed that, in addition to the remedies at law or in equity, Seller shall be entitled without the posting of a bond, to equitable relief in the form of specific performance, a temporary restraining order, temporary or permanent injunction, or any other equitable remedy which may then be available for the purposes of restraining Buyer from any actual or threatened breach of such covenants. Without limiting the generality of the foregoing, if Buyer breaches any provision of paragraph 14.1, such breach will entitle Seller to enjoin Buyer from disclosing any Confidential Information to any person and to enjoin such person from receiving or using any such Confidential Information. The rights and remedies of the Parties hereto are cumulative and shall not be exclusive, and each

such Party shall be entitled to pursue all legal and equitable rights and remedies and to secure performance of the obligations and duties of the other under this Agreement, and the enforcement of one or more of such rights and remedies by a Party shall in no way preclude such Party from pursuing, at the same time or subsequently, any and all other rights and remedies available to it.

## ARTICLE XV
## GENERAL PROVISIONS

15.1.    <u>Assignment</u>. The respective rights and obligations of the Parties to this Agreement may not be assigned by any Party without the prior written consent of the other, which consent may be withheld or delayed in the sole and absolute discretion of the non-assigning Party.

15.2.    <u>Successors and Assigns</u>. The terms and provisions of this Agreement shall be binding on and inure to the benefit of the successors and permitted assigns of the Parties.

15.3.    <u>Entire Agreement</u>. This Agreement together with the agreements referenced herein collectively constitute the entire agreement and understanding between the Parties hereto with respect to the subject matter of this Agreement and supersedes any and all prior discussions, agreements or other communications, whether written or oral, between the Parties hereto with respect to such subject matter. This Agreement may be amended only in writing executed by the Parties hereto.

15.4.    <u>Modification and Waiver</u>. This Agreement may not be amended, modified, or supplemented except by written agreement signed by the party against which the enforcement of the amendment, modification, or supplement is sought. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision. No waiver shall be binding unless executed in writing by the party making the waiver.

15.5.    <u>Attorney Fees</u>. If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees and other costs incurred in the action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

15.6.    <u>Fees and Expenses</u>. Except as otherwise specifically provided in this Agreement, Seller and Buyer shall pay their own fees and expenses in connection with the negotiation and consummation of the transactions contemplated by this Agreement.

15.7.    <u>Notices</u>. All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be (a) delivered in person or by courier, (b) mailed by first class registered or certified mail, or (c) delivered by facsimile transmission, as follows, or to such other address as a party may designate to the other in writing:

If to Seller:                      Mr. Kevin Westcott
                                   Universal Guardian Holdings, Inc.
                                   4695 MacArthur Court, Suite 300
                                   Newport Beach, California 92660
                                   Fax No. 949.861.8295

|                   |                                                    |
|-------------------|----------------------------------------------------|
| With Copy to:     | Mark V. Asdourian Esq.                             |
|                   | A Professional Corporation                         |
|                   | 4695 MacArthur Court, Suite 1000                   |
|                   | Newport Beach, California 92660                    |
|                   | Fax No. 949.221.0019                              |
| If to Buyer:      | Mr. Herbert Goertz                                |
|                   | Tagistics Corporation                             |
|                   | 102 N.E. 2nd Street, Suite 360                     |
|                   | Boca Raton, FL 33432                              |
|                   | Fax No. 561.207.7779                             |
| With copy to:     | Gregory Blodig, Esq.                              |
|                   | Greenspoon Marder, P.A.                           |
|                   | 100 West Cypress Creek Road, Suite 700            |
|                   | Fort Lauderdale, FL 33309                         |
|                   | Fax: 954.343.6962                                |

If delivered personally or by courier, the date on which the notice, request, instruction, or document is delivered shall be the date on which the delivery is made, and if delivered by facsimile transmission or mail as aforesaid, the date on which the notice, request, instruction, or document is received shall be the date of delivery.

15.8.    **Interpretation.** This Agreement has been negotiated at arms length between persons knowledgeable in the matters addressed herein. Each Party hereby represents that he, she or it has been represented or had the opportunity to be represented by experienced and knowledgeable legal counsel. Accordingly, any rule of law, including without limitation, Civil Code section 1654, or any other statutes, legal decisions or common law principles of similar effect, which would require interpretation of any ambiguities in this Agreement against the party that has drafted it is of no application and is hereby expressly waived.

15.9    **Headings.** All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.

15.10    **Arbitration.** Except for Lender's right to (i) bring an action to enforce or collect upon the Note; (ii) enforce its rights under the Security Agreement; (iii) seek injunctive relief; or (iv) specific performance, any claim, dispute or controversy arising out of or in connection with or relating to this Agreement or the breach or alleged breach thereof shall be submitted by the parties to binding arbitration under the rules of and before the American Arbitration Association ("AAA") sitting in the County of Orange, State of California before a single arbitrator agreeable to both Parties. Each party hereby waives any objections as to venue in Orange County, California, including, without limitation, any objections on the grounds of *forum nonconveniens* and submits to the jurisdiction of all of the federal and state courts of the State of California as well as the AAA sitting in Orange County. The cost of the arbitration shall be equally divided between the Parties. If the parties cannot agree on an arbitrator within two (2) weeks after arbitration is requested in writing by either of them, the arbitration shall proceed before an

- 16 -

arbitrator appointed by AAA. The AAA award shall be binding, each Party hereby expressly waiving its right to appeal, and rendered in such form that judgment may be entered thereon in any court having jurisdiction thereof. All awards of the arbitrator shall be binding and nonappealable. Judgment upon the award of the arbitrator may be entered in any court having jurisdiction. The prevailing party in any arbitration shall be entitled to receive his reasonable attorney's fees and costs as awarded by the arbitrator. All parties to this Agreement shall be entitled to the benefits provided by California Code of Civil Procedure section 1283.05 in any arbitration proceeding.

15.11.    Time of Essence. Time shall be of the essence with respect to the obligations of the Parties to this Agreement.

15.12    Severability. It is expressly understood and agreed that although the Parties consider the restrictions contained in this Agreement to be reasonable and necessary for the purpose of, among other things, preserving the goodwill, proprietary rights and going concern value of the Company, if any provision of this Agreement or the application of any such provision to any Party or circumstance shall be determined by any arbitration panel or court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to any Party or circumstance other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law. If the final judgment of an arbitration panel or court of competent jurisdiction declares or finds that any term or provision hereof is invalid or unenforceable, the Parties hereto agree that the arbitration panel or court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, or to delete specific words or phrases, and to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

15.13    Governing Law. This Agreement, and the application or interpretation of this Agreement, shall be governed exclusively by its terms and by the internal laws of the State of California, without giving effect to any conflict of laws provisions of such State.

15.14    Counterparts. This Agreement may be executed via facsimile and in counterparts, all of which shall be considered one and the same agreement, and shall become effective when one counterpart has been signed by each party and delivered to the other party hereto.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date of this Agreement.

SELLER:                                          BUYER:

ISR SYSTEMS CORPORATION                          TAGISTICS CORPORATION

By:_____                       By:_____
     Kevin Westcott,                                  Herbert Goertz,
     CEO                                              CEO

## SCHEDULE 1

## PERSONAL PROPERTY

A. <u>Hardware Assets Located in the Tustin, California datacenter and UGHO's storage unit (Buyer agrees to assume all costs of transporting any or all of the following):</u>

        SUN V20
        SUN 2200
        SUN 2100A
        SUN 2100B
        SUN 2100C
        DELL 1850A (Windows)
        DELL 1850B (Windows)
        DELL 2850A (Windows)
        DELL 2850B (Windows)
        CISCO PIX 525
        CISCO 1811
        CISCO 2950
        DILIGENT NAS (Storage)
        RARITIAN KVM16
        1U KVM
        LINKSYS SW2024
        IBM 4500R A   Server (Storage)
        IBM 4500R B   Server (Storage)
        IBM 4500 SCSI Disk System   (Storage)

B. <u>Inventory:</u>

    (i)     RFID tags; and
    (ii)    Packing material

C. <u>Equipment (Buyer agrees to assume all costs of transporting any or all of the following):</u>

    (i)     Three (3) Zebra Printers R110 XI – RFID Printers R110;
    (ii)    Symbol Handheld RFID Reader;
    (iii)   Symbol Fixed RFID Reader; and
    (iv)   Internex RFID Reader.

<u>SCHEDULE 2</u>
<u>SOFTWARE LICENSES AND CONTRACTS</u>

1.      SAP Software License Agreement*

| Date | 12/22/05 |
|------|----------|
| Parties | Systech Integrators, Inc. & Universal Guardian Holdings, Inc. |
| Status | Active |

      *Should SAP refuse to consent to an assignment of the SAP License to Buyer, then the Parties agree that the SAP License shall be excluded from this Agreement and Buyer shall be entitled to reduce the hosting services to be provided Seller in accordance with Section 3.3 of this Agreement.  In the event Buyer actually pays a fee for the assignment of the SAP License, then the hosting services to be provided by Buyer to Seller in accordance with Section 3.3 of this Agreement shall be reduced on a pro-rata basis at the rate of Five Thousand Dollars ($5,000.00) per month, provided Buyer provides Seller with written proof of the payment of such assignment fee.

2.      Orange County Online**

| Date | 12/1/2005 |
|------|-----------|
| Parties | Orange County Online & Universal Guardian Holdings |
| Status | Active |

3.      Whatsup Professional Software License Agreement**

| Date | 2006 |
|------|------|
| Parties | Ipswich & ISR Systems |
| Status | Active |

4.      Helpdesk Software License Agreement**

| Date | 2006 |
|------|------|
| Parties | Helpstar & ISR Systems |
| Status | Active |

5.      Doubletake Backup Software License Agreement**

| Date | 2006 |
|------|------|
| Parties | Sunbelt & ISR Systems |
| Status | Active |

6.      Loftware Software License Agreement**

| Date | 2006 |
|------|------|
| Parties | Loftware & ISR Systems |
| Status | Active |

7.    ZebraNet Bridge Software License Agreement and RFID Partner Agreement**

| Date | 2006 |
|------|------|
| Parties | Zebra Technologies  & ISR Systems |
| Status | Active |

8.    VMWARE ESX Software  License Agreement**

| Date | 2006 |
|------|------|
| Parties | Eventus  & ISR Systems |
| Status | Active |

**Should any one or more of these software providers refuse to consent to an assignment of their respective licenses to Buyer, then Buyer agrees that such software license(s) shall be excluded from the Assets defined under Section 1.1 without any recourse or offset whatsoever to Seller's rights hereunder and that Buyer waives Seller's obligation to sell and/or deliver such software licenses as required under Sections 4.2 and 9.1 of this Agreement.

## SCHEDULE 3

## THE TAG PLATFORM

All software relating to the TAG3 Platform including TagEasy, TagStation, and TagCentral as well as all software residing in the software repository, including, without limitation, the intellectual property rights set forth on Schedule II to that certain Share Exchange Agreement and Plan of Reorganization dated August 31, 2005, entered into by and between, inter alia, ISR Systems Corporation and MeiDa Information Technology, Ltd.

<u>SCHEDULE 4</u>

<u>INTANGIBLE PROPERTY</u>

1. **Performance Beyond Compliance Trademark Application No. 77010005. Buyer hereby acknowledges and accepts the following:**
   - The opposition period is completed and a notice of allowance was issued.
   - The notice of allowance (attached) must be responded to by December 11, 2007 to avoid abandonment.

2. **TAGeasy Trademark Application No. 78940428. Buyer hereby acknowledges and accepts the following:**
   - Final office action refusing to register the mark has been served.
   - This office action may be responded to by submitting a response satisfying the outstanding requirements detailed in the most recent office action, or by filing an appeal to the Trademark Trial and Appeal Board. The office action must be responded to by January 18, 2008 to avoid abandonment.

3. **TAGcentral Trademark Application No. 78941609. Buyer hereby acknowledges and accepts the following:**
   - Office action suspending further action has been served.
   - The examining attorney has searched the office records and has found no similar registered mark that would bar registration, but action on this application is suspended pending the disposition of Application 78636327 (BARCODECENTRAL). Since our filing date is subsequent to the effective filing date of BARCODECENTRAL, if and when it BARCODECENTRAL registers, it may be cited against our application.

4. **TAGstation Trademark Application No. 78941679. Buyer hereby acknowledges and accepts the following:**
   - Final office action refusing to register the mark has been served.
   - This office action may be responded to by submitting a response satisfying the outstanding requirements detailed in the most recent office action, or by filing an appeal to the Trademark Trial and Appeal Board. The office action must be responded by January 30, 2008 to avoid abandonment.

5. **Total Asset Guardian Trademark Application No. 78941761. Buyer hereby acknowledges and accepts the following:**
   - Final office action refusing to register the mark has been served.
   - This office action may be responded to by submitting a response satisfying the outstanding requirements detailed in the most recent office action, or by filing an appeal to the Trademark Trial and Appeal Board. The office action must be responded to by January 30, 2008 to avoid abandonment.

6. **<u>Domain Names</u>**

   (a)    www.tag3.com.

### SCHEDULE 5
### ASSUMED LIABILITIES

1. **Orange County Online**

| Date | 12/1/2005 |
|---|---|
| Parties | Orange County Online & Universal Guardian Holdings |
| Status | Active |

2. **SAP Software License Agreement**

| Date | 12/22/05 |
|---|---|
| Parties | Systech Integrators, Inc. & Universal Guardian Holdings, Inc. |
| Status | Active |

3. **Whatsup Professional Software License Agreement**

| Date | 2006 |
|---|---|
| Parties | Ipswich & ISR Systems |
| Status | Active |

4. **Helpdesk Software License Agreement**

| Date | 2006 |
|---|---|
| Parties | Helpstar & ISR Systems |
| Status | Active |

5. **Doubletake Backup Software License Agreement**

| Date | 2006 |
|---|---|
| Parties | Sunbelt & ISR Systems |
| Status | Active |

6. **Loftware Software License Agreement**

| Date | 2006 |
|---|---|
| Parties | Loftware & ISR Systems |
| Status | Active |

7. **ZebraNet Bridge Software License Agreement and RFID Partner Agreement**

| Date | 2006 |
|---|---|
| Parties | Zebra Technologies  & ISR Systems |
| Status | Active |

8. **VMWARE ESX Software  License Agreement**

| Date | 2006 |
|---|---|
| Parties | Eventus  & ISR Systems |
| Status | Active |

G:\GB\3738\0085\SCHEDULES 10-25-07.doc